**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 26, 2015**

# In the Court of Appeals of Georgia

A14A2138. ALL STAR, INC., et al. v. GEORGIA ATLANTA AMUSEMENTS, LLC.

BRANCH, Judge.

All Star, Inc., Elite Amusement, Inc., Ideal Amusements, Inc., Midtown Vending, LLC, and Ultra Group of Companies, Inc. (collectively "appellants"), appeal from an order of the Gwinnett County Superior Court granting summary judgment against them and in favor of Georgia Atlanta Amusements, LLC ("GAA"), on the appellants' claims for tortious interference with contractual relations. At issue in this case is OCGA § 50-27-70 et seq., which is the most recent statutory scheme

regulating the bona fide coin-operated amusement machine business in this State.[1] The trial court found that this law, which became effective on April 10, 2013, voided certain written contracts and/or oral agreements that four of the appellants had with their customers for the placement of coin-operated amusement machines. The trial court reached this conclusion even though the contracts at issue predate the law's enactment. Based on this holding, the trial court granted summary judgment against the appellants on their claims for tortious interference with contractual relations. On appeal from the summary judgment order, the appellants contend that OCGA § 50-27-70 et seq. should not be interpreted so as to void preexisting contracts. For reasons explained more fully below, we agree. We therefore reverse the trial court's order granting partial summary judgment against the appellants.

The relevant facts are largely undisputed but where any doubt existed, we have construed the record in favor of the appellants, as the non-movants. See *Thompson v. Lovett*, 328 Ga. App. 573 (760 SE2d 246) (2014) (on a motion for summary

---

[1] The statute defines "bona fide coin operated amusement machines" as "every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player . . . , and which can be legally shipped interstate according to federal law." OCGA § 50-27-70 (b) (2) (A).

judgment, we "construe the evidence in the light most favorable to the nonmovant") (citation omitted). The record shows that each of the appellants is a company that owns coin-operated amusement machines and is in the business of leasing those machines to third parties. At issue in this case are "Class B" coin-operated amusement machines ("Class B machines").[2] Prior to April 2013, all of the appellants other than Ideal Amusements had written rental contracts and/or oral rental agreements with specific business owners ("location owners") for the placement of one or more Class B machines within that business.[3] Each of the written contracts contained a clause

---

[2] The law defines a Class B machine as "a bona fide coin operated amusement machine that allows a successful player to accrue points on the machine and carry over points won on one play to a subsequent play or plays . . . and [r]ewards a successful player in compliance with the provisions of paragraphs (1) and (2) of subsection (d) of Code Section 16-12-35." OCGA § 50-27-70 (b) (4) (A). Thus, Class B machines must reward a player "exclusively with: (A) Free replays; (B) Merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than $5.00 received for a single play of the game or device; (C) Points, tokens, vouchers, tickets, or other evidence of winnings which may be exchanged for [any of the foregoing] rewards." OCGA § 16-12-35 (d) (1). Additionally, players of Class B machines "may accumulate winnings for the[ir] successful play . . . through tokens, vouchers, points, or tickets [and] . . . redeem accumulated tokens, vouchers, or tickets for noncash merchandise, prizes, toys, gift certificates, or novelties so long as the amount of tokens, vouchers, or tickets received does not exceed $5.00 for a single play." OCGA § 16-12-35 (d) (2).

[3] Appellant Ideal Amusements had two contracts for the placement of Class B Machines. Each of these contracts, however, was executed on or after April 10, 2013, and neither allegedly violated the statute at issue. Accordingly, these contracts were not subject to the trial court's summary judgment order and are not at issue on this appeal.

that set forth how the revenue generated by the leased machines would be divided between the company that owned the machines (the "machine owner") and the location owner. Similarly, under each of the oral agreements in place, the location owner had agreed to pay the machine owner a certain percentage of the revenue generated by the machine as rent for the machine. The specific agreements at issue are as follows:

*All Star*

On November 1, 2000, All Star entered into a written rental agreement with Fast Freddy's, a gas station and convenience store located in Lilburn. Under the terms of the this agreement, Fast Freddy's agreed to pay All Star 40 percent "of the total gross revenue"[4] generated by the machines as rent for the machines, with Fast Freddy's retaining 60% of the revenue. The contract was for a term of seven years and it contained an automatic renewal clause. That clause provided that the contract would automatically renew for additional terms of seven years unless one party notified the other, at least 90 days in advance of the renewal date, that it was electing

---

[4] Each of All Star's written contracts provides that gross revenue will be calculated after deductions for any amounts expended by the location owner on certain items, including sales tax, other fees required by law to be paid to the State, and refunds.

not to renew. There is no evidence in the record that either party exercised its right of non-renewal; thus, the contract renewed on November 1, 2007, for an additional seven-year term.

On March 28, 2011, All Star entered a written rental agreement with USA Food Mart, a gas station and convenience store located in Carrollton. Under the terms of this agreement, USA Food Mart agreed to pay All Star 70 percent of the total gross revenue generated by the machines, with USA Food Mart retaining the remaining 30 percent. The contract was for a term of three years.

As of April 2013, All Star had an oral agreement with Tienda Veracruz, a Carrollton grocery, and the agreement had been in place for approximately one year. There is no evidence in the record as to how the parties had agreed to split the revenue from the machine or machines placed at this location.

*Elite Amusement*

As of April 2013, Elite had in place oral agreements for the placement of its machines at five different locations: Discount Foodmart in Atlanta; the BP gas station in Stockbridge; East Side Tobacco in Conyers; Old National Hookah in Riverdale; and Tobacco More in Atlanta. Elite's agreement with Discount Foodmart had been in place seven years; its agreement with the Stockbridge BP had been in place six

5

years; its agreement with Old National Hookah had been in place six months; and its agreements with East Side Tobacco and Tobacco More had each been in place for three months. There is no evidence in the record as to how the parties had agreed to split the revenue from the machine or machines placed at these locations.

*Midtown Vending*

On August 2, 2010, Midtown Vending entered into two separate written rental agreements with Kahlid Amin for the placement of coin-operated amusement machines at two businesses owned by Amin in Fayetteville: Paw Paw's Shell and Coleman Grocery. Both of the agreements provided that the business in question would pay Midtown Vending 30 percent "of the total gross revenue"[5] generated by the machines as rent for the machines, with the businesses retaining 70 percent of the revenue. Each contract was for a term of 36 months.

On July 18, 2011, Midtown Vending entered a written rental agreement with Badi U. Zaman for the placement of coin-operated amusement machines in the Lakeview Country Store, a business owned by Zaman and located in Fayetteville. The

---

[5] Each of Midtown Vending's written contracts provides that gross revenue will be calculated after deductions for any amounts expended by the location owner on certain items, including sales tax, other fees required by law to be paid to the State, and refunds.

agreement provided that Zaman would pay Midtown Vending 30 percent "of the total gross revenue" generated by the machines as rent for the machines, with the Zaman retaining 70 percent of the revenue. This contract was for a term of 24 months.

*Ultra Group of Companies*

On August 14, 2008, Ultra entered a written rental agreement with Merchant Investment Group for the placement of coin-operated amusement machines in a Citgo Food Mart/ Sunoco in Tucker. Under the terms of this agreement, Ultra was to receive 30 percent "of the total gross revenue"[6] generated by the machines as rent for the machines, with Citgo/Sunoco retaining 70 percent of the revenue. The contract was for a term of ten years and therefore was in effect until August 14, 2018.

On May 4, 2011, Ultra entered into a written lease agreement with FNR/ENT, Inc. for the placement of coin-operated amusement machines in a Texaco station in East Point; On November 1, 2011, Ultra entered into a written lease agreement with East/West Convenience, Inc. for the placement of coin-operated amusement machines in a Chevron gas station and convenience store located in Conyers. That same day, Ultra also contracted with King Petro, Inc. for the placement of amusement machines

---

[6] The contract provides that gross revenue will be calculated after deductions for any amounts expended by the location owner on certain items, including sales tax, other fees required by law to be paid to the State, and refunds.

in a Shell station in Stone Mountain. These agreements had identical revenue terms, and each provided that Ultra would receive 30 percent of the "net revenue"[7] generated by the machines and that the location would retain the remaining 70 percent. The term of the rental agreement for the East Point Texaco was two years, while the contracts for both the Conyers Chevron and the Stone Mountain Shell had ten-year terms.

As of April 2013, Ultra had in place oral agreements for the placement of its machines at five different locations: Our Convenience Store in Atlanta; Stop'n'Save in Atlanta; the Shell gas station in Norcross; the Texaco gas station in Decatur; and Atlanta Food Mart in East Point. Ultra's agreement with Our Convenience Store had been in place nine years; its agreement with Stop'n'Save had been in place eight years and five months; its agreement with the Norcross Shell had been in place seven years and three months; and its agreement with the Decatur Texaco had been in place for six years and 11 months; and its agreement with the Atlanta Food Mart had been in place for six years. There is no evidence in the record as to how the parties had agreed to split the revenue from the machine or machines placed at these locations.

---

[7] Each of these agreements defined net revenue as the "gross revenue" generated by the machines "minus the dollar amount of the noncash redemptions awarded."

8

*The Statutory Scheme Enacted by HB 487*

At the time each of the foregoing contracts was made, nothing in the law governing coin-operated amusement machines addressed how the revenue from the machines had to be divided. Rather, the parties were free to divide the revenue any way they chose. In 2013, however, the legislature passed House Bill 487 ("HB 487"), now codified as OCGA § 50-27-70 et seq. One of the legislature's stated purposes of this bill was to "support the need to educate Georgia's children through the HOPE scholarship program and pre-kindergarten funding authorized by Article I, Section II, Paragraph VIII of the [Georgia] Constitution." OCGA § 50-27-70 (a). To accomplish this goal, the legislature required the Georgia Lottery Corporation to acquire, no later than July 1, 2014, a Class B accounting terminal to which all Class B machines could be linked by a communications network. OCGA § 50-27-101 (a). Additionally, the law requires all location owners hosting Class B machines to establish a bank account where all proceeds from these machines must be deposited, separate from any other funds belonging to the location owner. OCGA § 50-27-102 (c). Beginning six months after the Lottery Corporation acquired the Class B accounting terminal and after "successful testing" thereof, location owners are required to transmit all funds deposited in their respective Class B bank accounts to

9

the Lottery Corporation. Id. For the first fiscal year following the "successful implementation and certification of the Class B accounting terminal" the Lottery corporation is to retain 5 percent of the net receipts received from the location owners of Class B machines and is required to provide 47.5 percent of those net receipts to the location owner and 47.5 percent to the machine owner. OCGA § 50-27-102 (a). In each fiscal year following the first year, the Lottery Corporation's share of the net receipts "shall increase 1 percent, taken evenly from the location owner . . . and the [machine owner], to a maximum of 10 percent." OCGA § 50-27-102 (b). Thus, by approximately January 1, 2020, ten percent of the net proceeds from all Class B machines will go to the Lottery Corporation, with the location owner and the machine owner each receiving 45 percent of the remaining proceeds.

The statute also declared that from the time of HB 487's enactment until the implementation of the Class B accounting terminal, it would constitute an unfair business practice for either the machine owner or the location owner "to retain more than 50 percent of the proceeds generated by any Class B machine. . . ." OCGA § 50-27-87.1 (1). The law also makes it an unfair business practice for a location owner to "ask[ ], demand[ ], or accept[ ]," or for a machine owner to provide, "anything of value, including but not limited to a loan or financing arrangement, gift, procurement

10

fee, lease payments, revenue sharing, or payment of license fees or permit fees from a [machine owner], as an incentive, inducement, or any other consideration to locate bona fide coin operated amusement machines in that establishment." OCGA § 50-27-87.1 (3), (4). Engaging in any of these unfair business practice subjects a location owner or a machine owner to the revocation "of his or her state business license. . . for a period of one to five years per incident" and to a fine of "up to $50,000.00 per incident." OCGA § 50-27-87.1 (3), (4).

Finally, the new law also requires that all agreements between machine owners and location owners be in writing, OCGA § 50-27-87 (b) (1), and that these agreements be on file in both the machine owner's and the location owner's place of business. OCGA § 50-27-87 (b) (2). Additionally, each such agreement "entered into after April 10, 2013, shall be exclusive as between one bona fide coin operated amusement machine [owner] and one location owner or location operator per location." OCGA § 50-27-87 (b) (3).

*Appellants' Attempts to Comply With HB 487*

Following the enactment of HB 487, All Star, Midtown Vending, and Ultra each approached the location owners with whom they had written agreements and explained to the location owners that the law now governed the revenue split and that

11

any violation of the law could result in a substantial penalty. Each of these companies, therefore, asked their clients with whom they had written agreements to execute a new agreement (or an amendment to the existing agreement), which would reflect the statutorily-mandated revenue split. Additionally, All Star, Elite, and Ultra each approached the location owners with whom they had oral agreements and asked those owners to enter a written lease agreement which provided for a 50/50 revenue split. Each of these location owners refused to execute a new or amended agreement, allegedly because they had been offered more lucrative terms by GAA.[8] All Star, Elite, Midtown, and Ultra each refused to match these terms because they believed them to be illegal. Despite the existence of the agreements then in place, the clients of these appellants removed appellants' machines from their respective businesses and replaced those machines with ones owned by GAA.

---

[8] Representatives of All Star, Elite, and Midtown each averred that their respective clients informed them that GAA was offering the client 70 percent of the machine revenue and additional incentives to sign lease agreements with GAA. A representative of Ultra averred that Ultra's clients had informed him that GAA was offering each of the clients more than 50 percent of the machine revenue if the clients would lease their machines from GAA.

*The Current Lawsuit*

All Star, Elite, Ideal, Midtown, and Ultra filed the current lawsuit against GAA. Based on the foregoing facts, the appellants asserted claims for tortious interference with contractual relations and tortious interference with business relations. Additionally, Midtown Vending asserted a claim for destruction of personal property, based on the damage done to one or more of its machines.[9] The appellants sought to recover actual and punitive damages as well as attorney fees and expenses.

GAA filed a motion for partial summary judgment on the appellants' claims for tortious interference with contractual relations, arguing that because each of the written and oral agreements at issue provided for a revenue split other than 50/50, those contracts became illegal on April 10, 2013, the day that HB 487 became effective.[10] Thus, GAA contended that the contracts were void and unenforceable as

[9] The complaint also originally named GAA's owner, Nasimadin H. Virani, as a defendant, and it contained a count seeking to pierce the corporate veil and hold Virani personally liable. The appellants also asserted a claim for breach of public duty. The count seeking to pierce the corporate veil was dismissed voluntarily and without prejudice The count asserting a claim for breach of public duty was dismissed without prejudice via a consent order. In that same consent order, Virani was dismissed a a defendant.

[10] GAA also sought summary judgment as to the oral agreements on an additional ground. Specifically, GAA argued that because HB 487 required all rental agreements for Class B machines to be in writing, the oral agreements became void on the day HB 487 went into effect.

a matter of law and could not serve as the basis of a tortious interference with contracts claim. The trial court granted that motion, finding that "[a]ny agreements [that] do not provide for a 50/50 [revenue] split are . . . illegal, void, and unenforceable" and that "[t]he Court cannot reform the contracts to comport with the law." Thus, the trial court concluded that "any claim for tortious interference with contracts" as to these agreements failed as a matter of law. The appellants now appeal from this order.

As appellants concede in their reply brief, they have not appealed the trial court's ruling as to the oral agreements at issue in this case. Thus, the controlling question in this appeal is whether HB 487 rendered the written contracts at issue void. In analyzing this question, we begin with the fact that the contract clauses of both the Georgia and the United States Constitutions forbid the legislature from enacting "any law impairing the obligation of contracts." U.S. Const. Art. I, Sec. 10, cl. 1. See also Ga. Const. Art. I, Sec. I, Par. X (1983). Although the United States Supreme Court has held that this prohibition applies only to laws which substantially impair contracts, *Gen. Motors Corp. v. Romein*, 503 U. S. 181, 186-187 (II) (112 SCt 1105, 117 LE2d 328) (1992); *Energy Reserves Group v. Kansas Power & Light Co.,* 459 U. S. 400, 411 (II) (A) (103 SCt 697, 74 LEd2d 569) (1983), the total destruction of

14

a contract meets this requirement. Accordingly, if, as the trial court found, the law did destroy these agreements, we would be obligated to remand this case to the trial court for consideration of whether the law, as applied to pre-existing contracts with a revenue split of other than 50/50, violates the contracts clauses of the Constitutions of both Georgia and the United States.[11] Alternatively, if HB 487 did not void the contracts, then the summary judgment order must be reversed.

We start our analysis with the well-established legal principle that the State may exercise its police powers "to protect the lives, health, morals, comfort, and general welfare of the public." *Moore v. Ga. Pub. Svc. Comm.*, 242 Ga. 182, 183 (1) (249 SE2d 549) (1978) (punctuation omitted). And it is "accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U. S. 234, 241 (II) (A) (98 SCt 2716, 57 LE2d 727) (1978). Thus the State may, in the exercise of its police powers, enact

---

[11] GAA argues that appellants have waived any claim that HB 487 is unconstitutional because they failed to raise that claim in the court below in response to GAA's motion for partial summary judgment. The appellants, however, are not challenging the constitutionality of HB 487. Rather, they are asserting that the trial court erred in applying the statute to the contracts at issue so as to destroy them, because such an interpretation would render HB 487 unconstitutional as to preexisting contracts providing for a Class B machine revenue split of other than 50/50. In other words, appellants are arguing that the trial court's order created a question as to the constitutionality of HB 487.

regulations that place reasonable restraints on individuals' freedom to contract. See *Energy Reserves Group*, 459 U. S. at 410 (II) (A) ("[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people") (citation and punctuation omitted); *Moore*, 242 Ga. at 183 (1) (the State may exercise its police powers even "though contracts previously entered into between individuals may thereby be affected") (punctuation omitted).

As the United States Supreme Court has recognized, however, "private contracts are not subject to unlimited modification under the police power." *United States Trust Co. of New York v. New Jersey*, 431 U. S. 1, 22 (IV) (97 SCt 1505, 52 LE2d 92) (1977). Accordingly, any laws that affect contractual rights must be in furtherance of a legitimate public purpose, as this "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412 (II) (A) (footnote omitted). Provided that the government has acted in furtherance of a legitimate public interest, parties to private contracts will be required to adjust their contractual "rights and responsibilities" to accommodate the law, so long as the required adjustment is a reasonable means of furthering the public purpose at issue. Id. (citation and punctuation omitted).

16

Moreover, parties who contract with respect to a regulated industry or enterprise enter those contracts subject to further, reasonable regulation; when the subject of the contract is regulated, this fact controls, to some extent, the parties' reasonable expectations under the contract. See *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U. S. 470, 503-504 (IV) (107 SCt 1232, 94 LE2d 472) (1987); *Energy Reserves Group*, 459 U. S. at 408-409 (I) (D); *Union Dry Goods Co. v. Ga. Pub. Svc. Corp.*, 142 Ga. 841 (83 SE 946) (1914), aff'd, *Union Dry Goods Co. v. Ga. Pub. Svc. Corp.*, 248 U. S. 372 (39 SCt 117, 63 LE 309) (1919). In essence, such parties are presumed to contract with the knowledge that, regardless of the terms they agree to, subsequent reasonable regulation might require them to amend one or more of those terms. Id.

In *Union Dry Goods*, the Georgia Public Service Corporation ("GPSC") had contracted to provide Union Dry Goods, a mercantile company, with electricity at a specific rate for a five-year period. 142. Ga. at 842. At the time of the contract, the Railroad Commission of Georgia[12] had the authority to regulate power rates, but "there was neither statute nor rule of the Railroad [C]ommission regulating rates for the service contracted for." Id. After the contract had been in effect for a year, the

[12] The Railroad Commission is now known as the Public Service Commission. See *Georgia Public Service Commission v. Atlanta Gas Light Co.*, 205 Ga. 863, 870-871 (1) (55 SE2d 618) (1949).

GPSC applied to the Railroad Commission for permission to impose a rate increase. The Commission granted that application and "published an order declaring that the schedules of rates therein contained, until further order of the Commission, shall be the maximum schedules of rates to be charged by the Georgia Public Service Corporation for the classes of service indicated." Id. The maximum rates allowed under these schedules were in excess of the rates specified in the contract between the parties. Id.

After the Railroad Commission issued its order, GPSC began to bill the mercantile company at the maximum rate allowed under the rate schedule. Union Dry Goods then filed suit, seeking specific performance of the contract. When the trial court denied Union Dry Good's request for an injunction prohibiting GPSC from discontinuing its service unless Union Dry Goods paid the higher rate, the company appealed. Id. The Georgia Supreme Court noted that the "pivotal question" on appeal was "the effect of the [C]ommission's order on the contract between the dry goods company and the public service company. Did it empower the Georgia Public Service Corporation to disregard the contracted rate, and charge for the service at the maximum rate allowed by the [C]ommission?" Id. at 843. The court answered this question in the affirmative, noting that the State could exercise its police power to

regulate certain industries "and that the power is not destroyed because such regulations may to some extent affect the power to contract, or existing contracts." Id. at 844. Rather than finding that the contract was voided by the rate increase, however, the court found that the parties were expected to conform their contract to the law. Id. at 844. The court reasoned that the rate increase did not interfere with the reasonable expectations of the parties, as they were aware that they were contracting with respect to a regulated industry. Id. at 844-847. Thus, the parties were presumed to know that the State could enact regulations – including rate increases – that would impact the contract. "'One whose rights, such as they are, are subject to [s]tate restriction, cannot remove them from the power of the [s]tate by making a contract about them. The contract will carry with it the infirmity of the subject-matter.'" Id. at 844, citing *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 357 (28 SCt 529, 52 LE 828) (1905). In affirming the Georgia Supreme Court, the United States Supreme Court relied on this same rationale. See *Union Dry Goods Co.*, 248 U. S. at 375-376.

Almost 70 years later, the United States Supreme Court applied similar reasoning in *Energy Reserves Group*, 459 U. S. 400. That case involved two contracts for the intrastate purchase of gas from a specific gas field. Each contract contained

19

two "price escalator" clauses, one of which provided that if any governmental authority fixed a price for any natural gas that was higher than the price specified in the contract, the contract price would be increased to that level. 459 U. S. at 403. After the contracts were executed, the federal government enacted a law that changed the way it regulated the price of natural gas, replacing the federal price controls that had been established under the 1938 Natural Gas Act "with price ceilings that rise monthly based on 'an inflation adjustment factor' and other considerations." Id. at 405-406 (I) (B). In response, the Kansas state legislature passed a law that controlled intrastate natural gas prices and the contracts at issue became subject to the Kansas law. Id. at 407-408 (I) (C).

When the supplier sought to terminate the contracts based on the buyer's refusal to pay the higher gas rate allowed under federal law, the buyer responded that the Kansas act served to amend the parties price escalator clause, as it limited the supplier to the highest price allowed under Kansas law and prohibited the supplier from charging the higher rate allowed under federal law. Id. at 408 (I) (D). The trial court entered summary judgment in favor of the buyer, finding that the Kansas Act did not void the contracts, even though it amended the price that the supplier could

20

charge. Id. at 409 (I) (D) The Kansas Supreme Court affirmed the trial court, and the supplier then appealed to the United States Supreme Court.

In affirming the decision of the Kansas courts, the Supreme Court agreed that the Kansas law was enacted in furtherance of legitimate public purposes: the protection of "consumers from the escalation of natural gas prices caused by deregulation" and to correct "the imbalance between the interstate and intrastate [natural gas] markets." Id. at 417 (II) (C) (footnote omitted). The court then found that the law required the parties to conform their contract to the new regulation. In doing so, the Court noted that "[s]ignificant here is the fact that the parties are operating in a heavily regulated industry." Id. at 413 (II) (B) (footnote omitted). Thus, the parties should have reasonably anticipated that future governmental regulation might occur and that such regulation could impact the parties' contract. Id. at 416 (II) (B) (as the contract itself reflected, the supplier "knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations.").

Turning to the current case, we note that coin-operated amusement machines "have been permitted to operate in this state only by the grace of the legislature. In fact, amusement machines have been the subject of frequent and intensive regulation

21

in this state." *State of Ga. v. Old South Amusements*, 275 Ga. 274, 279 (3) (564 SE2d 710) (2002) (footnote omitted). Thus, when interpreting legislation which affects a change in the regulatory scheme governing these machines, we look to "cases involving regulated industries," as they "are more on point" than cases involving industries that are not subject to such regulation. Id. We therefore find the rationale of cases such as *Union Dry Goods* and *Energy Reserves Group* to be applicable to the instant case. Under that reasoning, where further regulation of an already regulated industry impacts private contracts, the parties to those contracts will be required to adjust their contracts to the new regulation, provided two conditions are met. First, the regulation must be in furtherance of a legitimate public purpose. Second, the regulation must constitute a reasonable method of furthering that public purpose.

Applying the foregoing principles, we find that HB 487 did not void any contracts for the placement of Class B machines that existed prior to the law's enactment, even if those contracts called for an uneven revenue split. The legislature's stated purpose for HB 487 (ensuring adequate funding for the State's HOPE Scholarship and pre-kindergarten programs) is a legitimate one, designed to benefit the general welfare of all Georgia's citizens. See *Pitts v. State*, 293 Ga. 511, 516-517 (2) (748 SE2d 426) (2013) ("ensuring that the children residing in Georgia

22

are afforded the opportunity of an education" is a "legitimate governmental interest"). Additionally, the regulatory requirements of HB 487 with respect to Class B machines represent a reasonable method of achieving this purpose, as they "will aid in the enforcement of the tax obligations that arise from the operation of bona fide coin operated amusement machine businesses as well as prevent unauthorized cash payouts." OCGA § 50-27-70. See *Keystone Bituminous Coal Assn.*, 480 U. S. at 505 ("we have repeatedly held that unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure" that impacts contract rights) (citations and punctuation omitted).

Furthermore, the parties to these contracts entered them with the knowledge that Class B machines were subject to changing state regulation.[13] And interpreting HB 487 as requiring the parties to adjust their contractual rights and responsibilities to the new law does not substantially impair any party's contract rights. Indeed, the law impacts only one term of the contract — the clause pertaining to the revenue split. All other rights and obligations under the contract remain unchanged. Moreover, the change affected by the law does not favor one party over the other —

_____

[13] "In 1978, the legislature exempted coin-operated amusement machines which awarded a player with up to 15 free replays from the definition of a gambling device. Ga. L.1978, p. 1779. Thirteen years later, the machines were permitted to reward a player with noncash prizes, toys and novelties, having a wholesale value of less than $5. Ga. L.1991, p. 1398. In 1996, the cap on free replays was removed and players were permitted to win noncash 'merchandise' and 'gift certificates' not exceeding a wholesale value of $5. Ga. L.1996, p. 309. In 1999, the reward system was expanded to authorize combinations of free replays, merchandise, toys, gift certificates, novelties, points, vouchers and tickets. Ga. L.1999, p. 1224."

*Old South Amusements*, 275 Ga. at 279 (3), n. 8. Additionally, in 2001 the legislature adopted the Video Poker Act, which outlawed as "gambling devices" a wide variety of video games which had been used previously in the coin-operated amusement machine business. See OCGA § 16-12-20; OCGA § 16-12-35; OCGA § 48-17-1 (2001). Thus, there were at least five significant legislative changes in the regulation of coin-operated amusement machines over an approximately 15-year period.

rather, it requires that both parties to the contract receive equal compensation from the revenue generated by Class B machines. Additionally, although the law might operate to take away a contractual advantage that one of the parties previously had (i.e., more than 50 percent of the revenue generated by the machine or machines being leased), the party suffering that loss could not recoup that loss on the open market if the party were freed from its current contract. Any legitimate, new contract such a party entered could not provide it with more than 50 percent of the machine revenue.

In light of the foregoing, we find that OCGA §50-27-70 et seq. requires the parties to any written lease agreements for Class B machines that existed prior to the enactment of HB 487, and which provide for a revenue split of other than 50/50, to conform their contracts to the new law. In other words, the preexisting written contracts remain intact, but between April 10, 2013 (the day HB 487 went into effect), and the date on which the Lottery Corporation's Class B accounting terminal became active, the parties to the contract were required to split the revenue realized form any Class B machine on an equal basis. After that time, the parties were to split the revenue as provided in OCGA § 50-27-102 for the duration of the contract term.

Because HB 487 did not void the written contracts at issue in this case, the order of the trial court granting summary judgment in favor of GAA and against

25

appellants on the appellants' claims for tortious interference with contractual relations

is reversed. The case is remanded for further proceedings consistent with this opinion.

*Judgment reversed. Barnes, P. J., and Boggs, J., concur*.