**FIRST DIVISION
BARNES, P. J.,
MARKLE and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.gov/rules**

**June 4, 2026**

# In the Court of Appeals of Georgia

A26A0307, A26A0337. ULTRA GROUP OF COMPANIES, INC.
    v. SINGH et al. (same)

A26A0416. SINGH et al v. ULTRA GROUP OF COMPANIES,
    INC.

HODGES, Judge.

These parties have been before this Court at least four times. Daljeet Singh and Raina Brothers, LLC (collectively "Singh") and Ultra Group of Companies, Inc. ("Ultra") are in the business of coin-operated amusement machines, which are often referred to as "COAMs." Following a dispute between the parties over a settlement agreement and a decision by a hearing officer awarding Ultra with damages and attorney fees, both parties sought review by the Georgia Lottery Corporation ("GLC") and, thereafter, the superior court. As relevant to this appeal, the superior court initially dismissed the parties' petitions for review, and the parties appealed

those dismissals in this Court. We vacated the superior court's decisions and remanded the appeals because it was unclear from the trial court's orders why the trial court dismissed the petitions.[1] *Singh et al. v. Ultra Group of Cos.*, 374 Ga. App. 22 (910 SE2d 834) (2024).

Following remand, the trial court issued orders upholding the hearing officer's award and the GLC's affirmance of that award. These appeals followed, and we have consolidated them for our review since the appeals arise out of the same statutory proceeding before a hearing officer appointed by the GLC. In Case Numbers A26A0307 and A26A0337,[2] Ultra argues that (i) the superior court's affirmance was legally erroneous because Singh breached the settlement agreement, and (ii) the superior court's failure to reverse a portion of the hearing officer's final award denying Ultra its full contract damages was reversible error. In Case Number

---

[1] Previously, Singh filed a direct appeal that this Court dismissed based on lack of jurisdiction, *Singh v. Ultra Group of Cos.*, Case No. A22A1675 (Feb. 23, 2023), and Ultra filed a direct appeal that this Court affirmed in an unpublished opinion, *Ultra Group of Cos. v. Singh*, 351 Ga. App. XXII (Case No. A19A1261) (Sep. 3, 2019).

[2] When the parties appealed to the superior court, the clerk of the superior court assigned different case numbers to the Ultra and Singh appeals. The trial court subsequently entered essentially identical orders in each case, and Ultra filed an appeal from the trial court's orders in both underlying superior court cases.

A26A0416, Singh argues that (i) the superior court and the GLC erred by allowing the hearing officer's analysis, findings, and conclusions to become the GLC's final order through inaction because the final award is arbitrary and capricious, and (ii) the award of attorney fees to Ultra, as affirmed by the GLC and the superior court, is arbitrary, capricious, and clearly erroneous. For the following reasons, we affirm in part, reverse in part, and remand the appeal with direction in Case Numbers A26A0307 and A26A0337, and we affirm the superior court's decision in A26A0416.

We begin with the pertinent facts set forth in our prior opinion, which we will supplement as needed to address the issues in this appeal:

> The underlying facts are largely undisputed. Ultra is a GLC master license holder, and it contracts with businesses to place its COAMs[3] inside stores or other commercial locations. Singh owns and operates

---

[3] By statute, COAMs are defined as machines

> of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player[.]

OCGA § 50-27-70 (b)(2)(A).

convenience stores throughout Georgia and also owns commercial real estate, where convenience stores and gas stations are located. On May 23, 2016, the parties reached an agreement to settle a lawsuit then pending in Gwinnett County.[4] Under the terms of the settlement agreement, Ultra agreed to dismiss its claims against Singh, and Singh agreed to provide, within 30 days, COAM contracts for eight years at two identified locations (one in Atlanta and another in Decatur), as well as COAM contracts for eight years at two unidentified locations within 12 months. If Singh failed to deliver the contracts on the unidentified locations within the specified time period, he agreed to pay Ultra $200,000.

Ultra dismissed its claims against Singh, but Singh never provided Ultra with any contracts or paid Ultra in connection with the settlement agreement. In fact, Singh previously sold the identified location in Atlanta in 2015, although he retained ownership of the real estate until 2023. And just a week after entering into the settlement agreement, Singh sold the identified location in Decatur.

Thereafter, Ultra filed a new breach-of-contract action in Gwinnett County, but the trial court granted Singh's motion to dismiss, finding that Ultra had to bring its claims to the GLC.[5] Ultra then filed a demand

[4] The record on appeal contains no further description of the Gwinnett County lawsuit underlying the 2016 settlement agreement.

[5] Ultra appealed the trial court's order granting Singh's motion to dismiss, but this Court affirmed that decision without opinion. See *Ultra Group of Cos., Inc. v.*

for arbitration. The matter proceeded to a hearing before a hearing officer in July 2023. And based on the evidence adduced at the hearing, the hearing officer issued an interim decision finding: (1) Singh was not in breach of contract for failing to provide a COAM contract at the identified location in Atlanta because Singh "had no legal relationship to the retail business there at the time" the parties entered into the settlement agreement; but (2) Singh otherwise breached the settlement agreement in failing to provide Ultra with COAM contracts at the identified location in Decatur and the two unidentified locations. The hearing officer rejected Ultra's request for lost profits, but awarded Ultra $100,000 in nominal damages for the identified location in Decatur and $200,000 in liquidated damages for the unidentified locations. The issue of attorney fees was reserved pending another hearing, after which the hearing officer entered its final award, finding that Singh acted in bad faith in entering into the settlement agreement and awarding Ultra an additional $100,000 in attorney fees and $18,600 in expenses.

Both parties then filed requests for reconsideration and motions for review to the chief executive officer of the GLC. The chief executive officer took no action on either party's motion, and the hearing officer's decision was affirmed by operation of law.[6] On November 21, 2023,

*Singh*, 351 Ga. App. XXII (Case No. A19A1261) (Sept. 3, 2019) (unpublished).

[6] See GLC Rule 13.2.5(1)(b)(4) ("For purposes of this Section, a Motion for Review shall be deemed denied if the President/CEO or his/her designee fails to provide a decision to either grant or deny the Motion of Review within 30 days from receipt of the Motion for Review."), COAM Division/Documents/RU 13.2 Coin

Singh filed a petition for judicial review in Fulton County Superior Court. In response, Ultra asked the superior court to "dismiss" Singh's petition, asserting that the hearing officer's award was supported by the evidence. Rather than filing a cross-appeal, Ultra also filed its own petition for review on November 27, 2023. In response to Ultra's petition, Singh filed a limited appearance, in which he claimed that he had not been properly served with Ultra's petition and, alternatively, the hearing officer did not err in making certain findings in his favor. Following a single hearing in both actions, the superior court entered identical orders in each case summarily dismissing the party's respective petitions and directing the clerk to close the files.

*Singh*, 374 Ga. App. at 22-24.

The parties appealed the trial court's dismissals of their petitions for review.[7]

This Court vacated and remanded the appeals because the superior court gave no basis

---

Operated Amusement Machine Hearing (available at https://www.gacoam.com/documents); see, e.g., *Ultra Group of Cos., Inc. v. S & A 1488 Mgmt., Inc.*, 357 Ga. App. 757, 758 (849 SE2d 531) (2020) ("The chief executive officer failed to render a decision within 30 days, and thus, pursuant to GLC Rule 13.2.5(1)(b)(4), affirmed the decision of the hearing officer." (footnote omitted)).

[7] "Although appeals from decision[s] of the superior courts reviewing decisions of state and local administrative agencies must come by discretionary application under OCGA § 5-6-35(a)(1), the GLC is not a state agency and, as a result, the parties were not required to file applications for discretionary review to seek review of the superior court's orders." *Singh*, 374 Ga. App. at 24 n. 7 (citation and punctuation omitted).

for its dismissals, and it was unclear from the trial court's orders why the trial court dismissed the petitions. *Singh*, 374 Ga. App. at 27-28.

Following remand, the trial court issued a final order affirming the hearing officer's final award and the GLC's affirmance of the award. These appeals followed.

1. *General COAM law*. We note at the outset the applicable general principles concisely and properly stated in our prior opinion:

> The ownership and operation of COAMs is a "highly regulated industry,"[8] governed by an extensive statutory scheme.[9] Importantly, the GLC has "jurisdiction of all disputes between and among any licensees or former licensees … relating in any way to any agreement involving" COAMs.[10] Such disputes are initially referred to a hearing officer,[11] who conducts a hearing in accordance with GLC rules, which must be

---

[8] *Stockton v. Shadwick*, 362 Ga. App. 779, 782(1)(a) (870 SE2d 104) (2022); see, e.g., *Funvestment Group, LLC v. Crittenden*, 317 Ga. 288, 291(2)(a) (893 SE2d 60) (2023) ("Our General Assembly has enacted legislation extensively regulating the COAM industry in this State.").

[9] See OCGA § 50-27-70 et seq.; *Gebrekidan v. City of Clarkston*, 298 Ga. 651, 656-57(3)(a) (784 SE2d 373) (2016) (referring to the statutory scheme governing COAMs, which is administered by the GLC, as "extensive").

[10] OCGA § 50-27-102(c)(1),(2).

[11] See OCGA § 50-27-102(c)(1),(2).

consistent with the Georgia Arbitration Code.[12] Once the hearing officer issues a decision, that decision "may be appealed to the chief executive officer" of the GLC.[13]

In turn, appeals from actions of the chief executive officer "shall be to the Superior Court of Fulton County."[14] Importantly, when an appeal is taken to the superior court,

> [t]he court shall not substitute its judgment for that of the [GLC] or chief executive officer as to the weight of the evidence on questions of fact committed to the discretion of the corporation or chief executive officer. The court may affirm the decision of the [GLC] or chief executive officer in whole or in part; the court shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the [GLC]'s

---

[12] See OCGA § 50-27-102(c)(3) (providing that the GLC must adopt rules consistent with the Georgia Arbitration Code); see generally OCGA § 9-9-1 et seq. (setting forth the Georgia Arbitration Code).

[13] See OCGA § 50-27-102(c)(5) ("The chief executive officer shall not reverse a finding of fact of the hearing officer if any evidence supports the hearing officer's conclusion. The chief executive officer shall not reverse a conclusion of law of the hearing officer unless it was clearly erroneous, arbitrary, and capricious or exceeded the hearing officer's jurisdiction.").

[14] OCGA § 50-27-76(a); see OCGA § 50-27-102(c)(5) (providing that "[t]he decision of the chief executive officer may be appealed to the Superior Court of Fulton County").

or chief executive officer's findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the [GLC] or chief executive officer;

(3) Made upon unlawful procedures;

(4) Affected by other error of law;

(5) Not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[15]

---

[15] OCGA § 50-27-76(b); see OCGA § 50-27-102(c)(5) (providing that the superior court "shall not reverse the chief executive officer's findings of fact unless it is against the weight of the evidence as set forth in Code Section 5-5-21, and the chief executive officer's legal conclusions shall not be set aside unless there is an error of law"); see generally OCGA § 5-5-21 (providing that a court may grant or refuse "new trials in cases where the verdict may be decidedly and strongly against the weight of the evidence even though there may appear to be some slight evidence in favor of the finding").

*Singh*, 374 Ga. App. at 24-25. In short, "[i]n reviewing the decision of the chief executive officer of the GLC, the superior court shall not reverse the chief executive officer's findings of fact unless it is against the weight of the evidence as set forth in Code Section 5-5-21, and the chief executive officer's legal conclusions shall not be set aside unless there is an error of law." *Ultra Group of Cos. v. S & A 1488 Mgmt.*, 357 Ga. App. 757, 758-59 (849 SE2d 531) (2020) (citation and punctuation omitted).

"When this Court reviews a superior court's order in an administrative proceeding, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative body." *S & A 1488 Mgmt.*, 357 Ga. App. at 759 (citation and punctuation omitted).

With these general procedures in mind, we turn to the terms of the parties' settlement agreement.

2. *Settlement agreement.* The terms of the May 23, 2016 settlement agreement are memorialized in a hearing transcript and are undisputed. Among other things, the agreement required Singh to provide Ultra with eight-year contracts to use COAMs at two identified locations: 6201 Memorial Drive in DeKalb County and 1317

Columbia Drive in Decatur. Specifically, Ultra's counsel stated at the settlement agreement hearing that Singh and Raina Brothers

> have agreed to transfer, to Ultra Group of Companies, two current locations — two locations, meaning, that they will provide written contract[s] for eight years for each of these locations. For Ultra to provide their coin — their coin operated amusement machines for those locations, that they would sign that agreement for eight years for two locations. One of which is ... at 1317 Columbia Drive, Decatur, Georgia. And the other location is at 6201 Memorial Drive, in DeKalb County. Both of those locations will sign a contract for Ultra for eight years for the use of those machines, pursuant to Ultra's contract terms. Okay. And that will be done for those two locations within a reasonable period of time, up to 30 days, to allow that transfer to be made through Georgia Lottery.

Singh's counsel agreed those were the correct terms.

The settlement agreement also required Singh to provide Ultra with eight-year contracts to use COAMs at two unidentified locations. Originally, Ultra's attorney stated in court that those unidentified locations also were to be delivered within six months of the settlement agreement or Singh would pay $400,000. However, after subsequent negotiation, the parties agreed that Singh would have twelve months to

11

provide the two unidentified locations, subject to the GLC's approval, or pay Ultra $200,000.

On January 13, 2017, a Gwinnett County Superior Court judge entered an order confirming the settlement agreement. Based on these general principles and the settlement agreement terms, we now address the parties' specific claims of error.

*Case Numbers A26A0307 and A26A0337*

3. Ultra argues that the superior court erred in affirming the hearing officer's decision that Singh did not breach the settlement agreement with regard to the 6201 Memorial Drive location and was not entitled to damages as to that location. We agree.

The undisputed and stipulated facts in these cases show that Singh agreed, in exchange for Ultra dismissing its claims against Singh in a prior lawsuit, that Singh would, among other things, "provide written COAM location contracts for eight years each at two identified locations," one being 6201 Memorial Drive. The parties do not dispute that a settlement agreement constitutes a valid and binding contract. It is also undisputed that Singh did not own, lease, or otherwise control the Memorial Drive property at the time he entered into the settlement agreement, and that Ultra was not

able to put its COAMs at the Memorial Drive location as promised by Singh. Without citing a single statute or case citation, the hearing officer in this case concluded that Singh was not in breach of the settlement agreement for failing to provide an eight-year contract with Ultra at 6201 Memorial Drive because Singh "had no legal relationship to the retail business there at the time the [a]greement was read into [the] record." The trial court's final order does not specifically address the 6201 Memorial Drive property, but simply "finds no basis upon which to reverse the [GLC's affirmance of the hearing officer's] Final Award." We conclude, however, that the hearing officer's conclusion regarding the 6201 Memorial Drive property was erroneous.

The issue presented in this case is whether, under Georgia law, a party who enters into a settlement agreement promising to allow another party to use a specific commercial location, despite not owning or controlling that property at the time of entering the agreement, may be liable for breach of contract. Given Georgia's well-settled law, we answer this question in the affirmative.

First, both our Supreme Court and this Court consistently have held that a person may contract to convey rights in property he does not own: "While a seller

cannot convey title to that which he does not own, that does not prevent him from contracting to convey property to be acquired by him in the future." *Sackett v. Wilson*, 258 Ga. 612, 614(2) (373 SE2d 10) (1988) (citations and punctuation omitted); *Goldgar v. N. Fulton Realty Co.*, 106 Ga. App. 459, 460(1) (127 SE2d 189) (1962) ("One may contract to convey property in the future conditionally upon his being able to acquire title thereto.") (citation and punctuation omitted). Thus, contrary to the hearing officer's conclusion, the fact that Singh had no legal relationship or title in the 6201 Memorial Drive property at the time he entered into the settlement agreement is irrelevant and does not automatically render the agreement a nullity.

Second, while a person may make a contractual obligation conditional upon his being able to acquire title from someone else, "if he contracts absolutely, he will be bound by the terms of his agreement." *Sackett*, 258 Ga. at 614(2) (citation and punctuation omitted). In other words, as our Supreme Court has made clear, "[a] party may contract to convey property not then owned by him. If he is not able to make delivery by the consummation date, he will be liable in damages for breach of contract." Id. (citation and punctuation omitted); *Smith v. Hooker/Barnes, Inc.*, 253 Ga. 514, 514-15(2) (322 SE2d 268) (1984); accord *Goldgar*, 106 Ga. App. at 460(1) ("If

14

[a party] contracts absolutely to convey property not then owned by him, he will be liable in damages for a breach, even if he is not able to secure the same so as to make delivery.") (citation and punctuation omitted). The ability of the contracting party to deliver title — whether it flows from the first party to the second party of the contract or from some third party to the second party of the contract — by the consummation date is the test for whether a party is liable for a *breach* of the contract. *Hosch v. Brown*, 258 Ga. 14 (364 SE2d 833) (1988). "Whether or not [a party to the contract] could have delivered good title on the closing date is not a question which addresses itself to the validity of the contract." *Horn v. Wright*, 157 Ga. App. 408, 409(2) (278 SE2d 66) (1981) (citations and punctuation omitted); accord *Albert v. Albert*, 164 Ga. App. 783, 783-84(1) (298 SE2d 612) (1982) (holding that "the fact that the [property] in question may have been owned by a non-party to the contract is not determinative of the issue of whether appellant agreed to transfer the [property] to appellee as part of the property settlement"). Indeed,

> One may contract and bind himself to sell that which he does not own, and if he fails to place himself in position to complete the sale at the time specified, he will be liable in damages to the promisee. His inability to convey a good title . . . does not affect the validity of his contract to

15

> convey a good and merchantable title to the whole fee or relieve him
> from liability for damages for his failure to do so.

*Deal v. Mountain Lake Realty*, 132 Ga. App. 118, 121(4)(b) (207 SE2d 560) (1974).

To be clear: Under Georgia law, a party who unconditionally promises to convey rights in property — even property he does not own — assumes the risk of his own inability to perform. If he cannot deliver because he lacks ownership or control, he is liable for breach of contract and damages. We conclude that this analysis remains the same whether a party unconditionally promises to sell property or simply to grant the use or lease of property.

With respect to the 6201 Memorial Drive location in the present action, it is clear that the settlement agreement is unconditional.[16] In exchange for Ultra

---

[16] Although Singh asserts in his brief that his obligation to provide a contract for the Memorial Drive property was conditional on approval by the GLC, and such approval was not granted, we find no merit to this argument. Pretermitting whether the condition applied to the 6201 Memorial Drive location, Singh points to no evidence in the record indicating that the GLC failed to approve this transfer. It is true that the final order in a prior case between Ultra and Rabisn, LLC, the owner of the 6201 Memorial Drive property at the time of the settlement agreement, found that Rabisn did not have a contract with Ultra and that Singh was not Rabisn's agent. However, that does not affect Singh's ability to contract with Ultra to provide property or leasing rights to the 6201 Memorial Drive location not then owned by him and Singh's liability for breach of contract if he was unable to deliver the rights by the consummation date. See *Sackett*, 258 Ga. at 614(2).

dismissing its claims against Singh in a prior lawsuit, Singh contracted to, among other things, "provide written COAM location contracts for eight years each at two identified locations," one being 6201 Memorial Drive. Singh's commitment is a legally enforceable promise. Singh subsequently was unable to deliver on his contractual promise because he lacked the legal authority to grant the use of the Memorial Drive location. As stated previously, however, the fact that Singh had no legal relationship or title in the 6201 Memorial Drive property at the time he entered into the settlement agreement is irrelevant, and Singh can be held liable for breach of contract for failing to perform under the contract. The hearing officer's conclusion that Singh could not be held liable for a breach of contract was erroneous, and the GLC and superior court erred in upholding that conclusion.[17]

---

[17] Singh asserts in passing, by adopting and incorporating arguments he presents in Case No. A26A0416, that the promulgation of GLC Rule 13.1.14(25) made the settlement agreement illegal and unenforceable with respect to the 6201 Memorial Drive location. As discussed more fully in Case No. A26A0416, GLC RU 13.1.14(25) provides, in part, that COAM licensees are not to conduct licensed activity on behalf of another COAM licensee. Singh's argument fails with respect to the Memorial Drive location because, as we conclude in Division 5(c)(i), GLC Rule 13.1.14(25) has no bearing on the locations identified in the settlement agreement, including the 6201 Memorial Drive location. The parties entered into the settlement agreement on May 23, 2016, and the contracts were to be provided within 30 days, which would have been June 22, 2016. GLC RU 13.1.14(25) was not effective until July 21, 2016, nearly 60 days after Singh entered into the May 23, 2016 settlement agreement and 30 days

Having determined that Singh may be responsible for breach of the settlement agreement by failing to provide Ultra with an eight-year lease at the 6201 Memorial Drive location within 30 days of the agreement, we necessarily conclude that the case must be remanded for a determination of whether Singh, in fact, breached the settlement agreement, whether Ultra is entitled to damages based on any breach, and, if so, the extent of the damages.

4. Ultra next argues that the superior court erred in affirming the hearing officer's decision that Ultra was not entitled to lost-revenue damages for the 1317 Columbia Drive location. We disagree.

Ultra claimed actual damages of over $793,000 for the breach of the settlement agreement pertaining to the 1317 Columbia Drive location. It based this amount upon

---

after Singh had already breached the settlement agreement by failing to provide a COAM contract for the 6201 Memorial Drive location. Accordingly, the later-enacted COAM rule cannot be used as a defense to a claim under the settlement agreement with respect to the 6201 Memorial Drive location. See *Bryant v. PMC Cap., Inc.*, 244 Ga. App. 313, 315(1) (535 SE2d 319) (2000) (holding that a subsequently enacted administrative regulation could not affect the parties' rights in a validly entered contract because "[l]aws prescribe only for the future; they cannot impair the obligation of contracts nor, ordinarily, have a retrospective operation") (citation and punctuation omitted).

historical collection data generated by the operation of the COAM by the master

licensee at that location from the date of the settlement agreement, May 23, 2016,

through June 23, 2023. When testifying by deposition about his calculations, Ultra's

risk and compliance manager continuously used the terms "an average" and "on

average." He noted,

> obviously there are going to be machines that people prefer, play, things
> like that. But we are talking about a calculation of average performance
> per day regardless of machine type for that particular business date. This
> is how much it made on that day. And then we did an average of that and
> then carried that on for one year and eight year[s].

The arbitrator determined that Ultra failed to specifically prove its lost profits with

reasonable certainty and awarded only nominal damages in the amount of $100,000,

which the GLC chief executive officer affirmed by his inaction and the superior court

affirmed without comment. We conclude that this finding was not erroneous.

In general, when calculating damages for a breach of contract, "the person

injured, is, so far as it is possible to do so by a monetary award, to be placed in the

position he would have been in had the contract been performed." *Broad. Concepts v.*

*Optimus Fin. Servs.*, 274 Ga. App. 632, 635(3) (618 SE2d 612) (2005) (citation and

punctuation omitted). With respect to lost profits, such damages "must be shown with reasonable certainty and profits which are remote, or speculative, contingent or uncertain are not recoverable." *McMillian v. McMillian,* 310 Ga. App. 735, 739 (713 SE2d 920) (2011) (citation and punctuation omitted). "That said, the rule that lost profits cannot be speculative or uncertain relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages[,]" and "mere difficulty in fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance, when the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted." Id. at 739-40 (citations and punctuation omitted). However, it is well settled in Georgia

> that anticipated profits are too speculative and uncertain to be recoverable unless they are based on an *actual* track record of sales. And this requirement is based on the rationale that the profits of a commercial business are dependent on so many hazards and chances, that unless the anticipated profits are capable of ascertainment, and the loss of them traceable directly to the defendant's wrongful act, they are too speculative to afford a basis for the computation of damages.

*EZ Green Assocs. v. Ga.-Pac. Corp.*, 331 Ga. App. 183, 188-89(2) (770 SE2d 273) (2015) (citations and punctuation omitted).

Specifically relating to COAMs, this Court previously has ruled that Ultra failed to prove lost profits under nearly identical circumstances. See *S & A 1488 Mgmt.*, 357 Ga. App. at 760-62(2). In *S & A 1488 Mgmt*, Ultra sought, among other damages, lost profits from the date of the store sale until the end of a ten-year contract term after the new owner removed its COAMs from the store. Id. at 758. Ultra claimed actual damages by "calculating the average monthly revenue of the COAMs while the COAMs were still at the store, multiplying by the remaining number of months left in the contract, applying a present value discount, and subtracting $25,000 for the residual value of the five COAMs." Id. at 760(2). This Court reiterated the general principles of determining contract damages:

> Where property was leased for hire, the measure of damages for the lessee's breach of contract is the cash value of the contract less any saving which may accrue from the breach. A party must show lost profits with great specificity, reasonable certainty, and with a proven track record of profitability. Where appropriate action to mitigate the loss has not been taken, damages in the nature of lost profits are not recoverable.

Id. at 760-61(2) (citations and punctuation omitted). In affirming the hearing officer's finding that Ultra failed to prove its lost profits using the historical performance of its own machines in the specified location, we noted that Ultra failed to show whether the COAMs had been re-rented, despite testimony that Ultra kept records regarding this information, thus failing to account for savings which may have accrued from the breach and failing to prove its lost profits with reasonable certainty. Id. at 761(2).

We likewise find that Ultra failed in the present case to prove its lost profits with reasonable certainty. Here, Ultra attempted to prove lost profits using data collected from COAMs in completely separate businesses which were subsequently installed at the 1317 Columbia Drive location. Ultra did not specify whether those COAMs were the same type that they would have installed nor did they indicate that those machines might be of comparable quality or popularity with players. In addition, as noted by the hearing officer, Ultra "had the ability to track the machines taken out of 1317 Columbia Drive but failed to do so and failed to give any credit for the re-renting of any such machines in its damage calculation." We thus conclude, as we did in *S & A 1488 Mgmt*, that Ultra failed to prove its lost profits with reasonable certainty.

The superior court did not err in refusing to reverse the hearing officer's findings as to lost profits at the 1317 Columbia Drive location.

In short, in Case Numbers A26A0307 and A26A0337, we affirm the hearing officer's finding, adopted without comment by the superior court, that Ultra was not entitled to lost-revenue damages for the 1317 Columbia Drive location. However, we reverse the hearing officer's finding, also adopted without comment by the superior court, that Singh could not be held liable for a breach of contract regarding the 6201 Memorial Drive location, and we remand for a determination of whether Singh, in fact, breached the settlement agreement with respect to this location, whether Ultra is entitled to damages based on any such breach, and, if so, the amount of the damages for which Singh is responsible.

*Case Number A26A0416*

5. In this appeal, Singh argues that the GLC chief executive officer and superior court erred by allowing the hearing officer's analysis, findings, and conclusions to become the GLC's final order through inaction because the final award is arbitrary and capricious. Specifically, Singh asserts that COAM regulations "made performance [of the agreement] illegal and impossible" and that the hearing officer "manifestly

disregarded this argument" and "irrationally found that [Singh's] inability to perform stemmed from [his] sale of a COAM location[.]" We disagree with all of Singh's arguments.

(a) To the extent that Singh asserts it was error for the GLC chief executive officer to fail to act on his appeal from the hearing officer's decision, allowing the decision to be affirmed as a matter of law, we find no error. In fact, the law provides for just such a situation. GLC Rule 13.2.5(1)(b)(4) specifically states, "For purposes of this Section, a Motion for Review shall be deemed denied if the President/CEO or his/her designee fails to provide a decision to either grant or deny the Motion of Review within 30 days from receipt of the Motion for Review."). See COAM Division/Documents/RU 13.2 Coin Operated Amusement Machine Hearing ( a v a i l a b l e a t https://www.gacoam.com/API/Documents/Document?documentID=822). This Court repeatedly has applied this rule. See, e.g., *Coin-Op Solutions, LLC v. Metro Carrollton Corp.*, 360 Ga. App. 44, 45 (860 SE2d 599) (2021) (finding adverse decision of the hearing officer affirmed by operation of law when the chief executive officer failed to act on the petitioner's appeal of the hearing officer's award); *S & A 1488*

*Mgmt.*, 357 Ga. App. at 758 ("The chief executive officer failed to render a decision within 30 days, and thus, pursuant to GLC Rule 13.2.5(1)(b)(4), affirmed the decision of the hearing officer.") (footnote omitted). The aggrieved party may then appeal the chief executive officer's decision to the superior court, as Singh did in this case. OCGA § 50-27-102(c)(5) ("The decision of the chief executive officer may be appealed to the Superior Court of Fulton County[.]").

(b) Turning next to Singh's argument that the superior court erred in affirming the hearing officer's decision, we first reiterate the standard of review for the superior court. On review to the superior court, a finding of fact by the GLC chief executive officer, whether specifically stated or affirmed by operation of law, shall only be reversed if "it is against the weight of the evidence" and a conclusion of law "shall not be set aside unless there is an error of law." OCGA § 50-27-102(c)(5). "If arbitrary and capricious action is alleged the court must determine whether a rational basis exists for the decision made." *Atlanta Gas Light Co. v. Ga. Pub. Serv. Comm'n.*, 212 Ga. App. 575, 580(2) (442 SE2d 860) (1994) (reviewing an administrative decision of the Georgia Public Service Commission under the Administrative Procedure Act) (citation and punctuation omitted).

Here, Singh argues that the superior court should have found that the hearing officer's "manifest disregard for COAM regulations renders her Final Award arbitrary and capricious[.]" Our duty when reviewing a superior court's order in an administrative proceeding "is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative body." *S&A 1488 Mgmt.*, 357 Ga. App. at 759 (citation and punctuation omitted).

(c) *Illegality and impossibility*. Singh attempts to avoid his prima facie breach of the settlement agreement by claiming that GLC RU 13.1.14(25), a regulation enacted on July 21, 2016, almost two months after Singh and Ultra entered into their settlement agreement on May 23, 2016, "made performance illegal and impossible," excusing the admitted nonperformance of his obligations under the settlement agreement. We conclude that this claim lacks merit.

GLC RU 13.1.14(25) prohibits COAM licensees from conducting licensed activity on behalf of another COAM licensee:

> COAM licensed activity shall be performed by only a person or entity that holds a valid COAM license for that activity. Except as provided in this subsection, a COAM license holder shall not allow any other person

or entity to perform licensed activity for or on behalf of such COAM license holder. A person or entity that holds a valid COAM license shall not conduct COAM licensed activity for or on behalf of another COAM license holder. COAM licensed activity shall mean: facilitating or managing the placement of COAMs between or among COAM licensees or prospective COAM license applicants; operating COAMs; ... or similar activities.

Singh first argues that the hearing officer in this action "manifestly disregarded" his argument regarding the impact of GLC RU 13.1.14(25) on the settlement agreement. The record belies this assertion.

As Singh points out, to meet the "manifest disregard for the law" standard for vacating an arbitration award under OCGA § 9-9-13(b)(5), the arbitrator "must be conscious of the law and deliberately ignore it." See *Lang Enters. Ltd. v. Alcue Props. & Interiors*, 368 Ga. App. 88, 89-90(1) (889 SE2d 210) (2023) (citation and punctuation omitted). There must be "clear evidence of the arbitrator's intent to purposefully disregard the law[.]" Id. at 90(1) (citation and punctuation omitted). The burden of showing a manifest disregard of the law is on the party seeking to vacate the award. See *Berger v. Welsh*, 326 Ga. App. 290, 296(3) (756 SE2d 545) (2014); accord *Gainesville Mech. v. Air Data*, 350 Ga. App. 614 (829 SE2d 838) (2019).

Here, the hearing officer directly addressed Singh's COAM regulation argument, stating in her final award that GLC RU 13.1.14(25) "is inapposite" because Singh could have lawfully complied with his agreement obligation despite the subsequent enactment of the regulation. Singh has failed to demonstrate that the hearing officer deliberately ignored the regulation. See *Lang Enters.*, 368 Ga. App. at 89-90(1). Moreover, as discussed more fully below, we find that the record evidence supports the hearing officer's conclusion.

> In Georgia, a contract to do an illegal thing is void. But a contract does not fall within this principle unless its object or purpose is illegal. The prohibition does not apply where the object of the contract is not illegal or against public policy, but where the illegality is only collateral or remotely connected to the contract.

*Five Star Athlete Mgmt. v. Davis*, 355 Ga. App. 774, 776(1) (845 SE2d 754) (2020) (citation and punctuation omitted). "The rule that an agreement in violation of law is invalid does not always apply where the existence of the thing in question is due to a violation of law only in the sense that incidentally some law was violated in its production," where the agreement may have been created without the violation.

28

*Shannondoah, Inc. v. Smith*, 140 Ga. App. 200, 202 (230 SE2d 351) (1976) (citation and punctuation omitted).

In this case, it is undisputed that the settlement agreement was for a legal purpose. In exchange for Ultra dismissing its claims against Singh in a prior lawsuit, Singh agreed to provide COAM location contracts at four locations, including two identified and two unidentified locations. In fact, Singh admits that "when entered, the [s]ettlement [a]greement was not illegal and performance was not impossible." Rather, he argues that the subsequent enactment of GLC RU 13.1.14(25) made his performance under the settlement agreement illegal and impossible. We thus turn to that argument.

(i) *Identified locations*. Contrary to Singh's assertion, GLC RU 13.1.14(25) has no bearing on the 1317 Columbia Drive location. The parties entered into the settlement agreement on May 23, 2016, and the contract for this location was to be provided within 30 days, which would have been June 22, 2016. GLC RU 13.1.14(25) was enacted on July 21, 2016, nearly 60 days after Singh entered into the May 23, 2016 settlement agreement and 30 days after Singh had already breached the settlement agreement by failing to provide a COAM contract for this identified location.

"Laws prescribe only for the future; they cannot impair the obligation of contracts nor, ordinarily, have a retrospective operation." OCGA § 1-3-5. See also *Bryant v. PMC Cap., Inc.*, 244 Ga. App. 313, 315(1) (535 SE2d 319) (2000) (holding that a subsequently enacted administrative regulation could not affect the parties' rights in a validly entered contract). The later enacted GLC RU 13.1.14(25) cannot be used as a defense to a claim under the settlement agreement with respect to the 1317 Columbia Drive location, and the hearing officer did not err in finding that the rule did not make Singh's obligation under the settlement agreement illegal or impossible with respect to this identified location.[18] See *Bryant*, 244 Ga. App. at 315(1).

Moreover, even if GLC RU 13.1.14(25) would have made the settlement agreement illegal with respect to the 1317 Columbia Drive location, the subsequent implementation of the rule did not impact that location in particular because "[a] party cannot by [his] own act place [himself] in a position that renders [him] unable to perform, then plead that this inability to perform provides an excuse for

---

[18] Singh makes no claim in this appeal with respect to the 6201 Memorial Drive location, presumably because the hearing officer ruled against Ultra as to that identified location. However, we conclude, as stated previously in footnote 17, that the same analysis applies to the Memorial Drive location identified in the settlement agreement.

nonperformance." *Ambrosio v. Giordano*, 358 Ga. App. 764, 769(3) (856 SE2d 349) (2021) (citation omitted). The record shows that Singh sold the 1317 Columbia Drive location on May 30, 2016, just seven days after he executed the settlement agreement. And, contrary to Singh's assertion that no evidence supported the hearing officer's finding that he had a COAM license at the time he sold the retail business at that location, Singh himself testified that he was "sure" there were COAMs in the store when he sold it, and he was "sure" he would have had a COAM location license because COAMs were present. In addition, location licensee finance reports from the Georgia Lottery Commission verified that COAM activity took place at the Columbia Drive location from the date of the settlement agreement on May 23, 2016, through August 14, 2016. Accordingly, the record supports the hearing officer's conclusion that, with respect to the Columbia Drive location, Singh "had the legal ability to provide Ultra with an 8-year contract as required by the [settlement] [a]greement until [Singh] voluntarily chose to sell [his] retail business at 1317 Columbia Drive." We affirm the hearing officer's conclusion, affirmed by the superior court, that Singh breached the settlement agreement with respect to the Columbia Drive location.

(ii) *Unidentified locations.* With respect to the two unidentified locations that Singh agreed to provide within 12 months of the settlement agreement, we agree with the superior court's determination that substantial evidence in the record supported the hearing officer's conclusion that the subsequent enactment of GLC RU 13.1.14(25) did not make Singh's performance under the agreement illegal and impossible as to these locations.

First and foremost, this portion of the settlement agreement specifically noted that if Singh failed to provide the two unidentified locations within 12 months, Ultra would be entitled to a $200,000 judgment. Accordingly, even if it would have been illegal for Singh to provide the two unidentified locations, nothing in the regulation barred him from complying with the settlement agreement by paying Ultra the $200,000 alternative option. See *Grayhawk Homes v. Addison*, 355 Ga. App. 612, 616(2) (845 SE2d 356) (2020) (recognizing that "where [an] agreement is founded on a legal consideration containing a promise to do several things or to refrain from doing several things, and only some of the promises are illegal, the promises which are not illegal will be held to be valid") (citation and punctuation omitted). There is no dispute that this was not done.

In addition, as mentioned previously, a party cannot plead an inability to perform if his own actions caused him to be unable to perform. *Ambrosio*, 358 Ga. App. at 769(3). The record shows that at the time of the settlement agreement, Singh was the landlord or owned retail stores with COAMs, during which time he could have performed his obligations under the settlement agreement; however, he made a conscious, deliberate decision to sell these locations and shift his business focus away from operating location licensees to operating master licenses. According to Singh, "[w]e were in the retail business long enough. [It was] time to move up in the line." The record supports the hearing officer's findings that Singh made a unilateral choice "because he simply wanted out of the retail business side of convenience stores[,]" and he "could have lawfully complied with [his] obligation to provide for two additional 8-year contracts by acquiring businesses and location licenses at two additional locations" but "simply chose not to do so." We conclude that evidence supported the hearing officer's determination that Singh owed Ultra $200,000 based on his nonperformance of this portion of the settlement agreement.

In an attempt to circumvent the fact that GLC RU 13.1.14(25) did not make the settlement agreement illegal or impossible, Singh argues that the hearing officer also manifestly disregarded GLC RU 13.1.13(10). That regulation provides as follows:

> Beginning on July 1, 2013, no person, or immediate family member of a person, with or applying for a [l]ocation [o]wner's or [l]ocation [o]perator's license shall have an interest in any person, or immediate family member of a person, with a [m]aster [l]icense, or doing business as a [d]istributor, or [m]anufacturer in this state.

According to Singh, the hearing officer "irrationally found" that he could have satisfied his contractual obligations by acquiring businesses and location licenses at two additional locations because GLC RU 13.1.13(10) required him to divest his COAM location interests "after his wife became a [m]aster [l]icensee." This argument also fails for a number of reasons.

First, as stated above, Singh had the option under the settlement agreement of paying Ultra $200,000 instead of providing contracts at two unspecified locations. This option survived any purported illegality under GLC RU 13.1.13(10) regarding Singh's ability to provide the two unidentified locations due to his wife becoming a master licensee.

Second, Singh acknowledges in his appellate brief that "[n]o testimony or evidence established when [his] COAM licenses were divested, or under whose name the COAMs operated." In addition, Singh does not point to any evidence in the record indicating when his wife obtained her master license. In fact, the superior court's order notes, "It is unclear to this [c]ourt exactly when Singh's wife became a master licensee[.]" If Singh desired to use GLC RU 13.1.13(10) as a defense in this breach of contract action, it was his responsibility to provide evidence that the defense applied. See OCGA § 9-11-8(c) (delineating illegality as an affirmative defense); *Gower v. Ozmer*, 55 Ga. App. 81, 84 (189 SE 540) (1936) ("The burden is on the party attacking the legality of a contract, or a portion thereof, to show that it is illegal."). His failure to do so deprives him of the ability to argue that the hearing officer manifestly disregarded this defense.

Third, it is well settled that "impossibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse nonperformance of a contractual obligation." *Bright v. Stubbs Props.*, 133 Ga. App. 166, 167 (210 SE2d 379) (1974) (citation and punctuation omitted). Indeed, "[t]he inability to control the actions of a third person whose consent or cooperation is needed for the

performance of an undertaking is ordinarily not to be regarded as an impossibility avoiding the obligation." Id. (citation and punctuation omitted). Here, Singh acknowledged that it was a "family decision" to transition from landlords and owners of businesses with COAM location licenses into the master license business. Singh's wife could have chosen not to apply for a master license, or she could have given up her master license, to avoid any purported illegality associated with compliance with the settlement agreement, but Singh and his wife chose not to comply, creating the condition he now claims makes the settlement agreement illegal. Singh's inability to acquire businesses at two additional locations due to personal reasons does not render his performance under the settlement agreement illegal or impossible, and it does not excuse the nonperformance of his contractual obligation under the settlement agreement. See *Bright*, 133 Ga. App. at 167; see also *Ambrosio*, 358 Ga. App. at 769(3).

In short, the evidence supports the hearing officer's conclusion that performance of the settlement agreement was not made illegal or impossible due to GLC RU 13.1.14(25), and Singh failed to demonstrate that GLC RU 13.1.13(10) made performance of the settlement agreement illegal or impossible. The superior court, therefore, did not err in affirming the hearing officer's conclusion that Singh breached

the settlement agreement with respect to the Columbia Drive and unidentified locations.

(d) *Reformation*. Singh argues that the enactment of GLC RU 13.1.14(25) required that the parties' settlement agreement be reformed to comport with the new regulation. We disagree.

It is well settled that

> parties who contract with respect to a regulated industry or enterprise enter those contracts subject to further, reasonable regulation; when the subject of the contract is regulated, this fact controls, to some extent, the parties' reasonable expectations under the contract … [and] such parties are presumed to contract with the knowledge that, regardless of the terms they agree to, subsequent reasonable regulation might require them to amend one or more of those terms.

*All Star, Inc. v. Ga. Atlanta Amusements, LLC*, 332 Ga. App. 1, 9 (770 SE2d 22) (2015) (applying the rule to the COAM industry) (citations omitted). "[W]here further regulation of an already regulated industry impacts private contracts, the parties to those contracts [generally] will be required to adjust their contracts to the new regulation[.]" Id. at 12.

Although the COAM industry is heavily regulated, the enactment of GLC RU 13.1.14(25) did not require Singh or Ultra to reform their settlement agreement because the new regulation did not conflict with any of the agreement's terms or, as we concluded above, cause performance under the agreement to become illegal or impossible. Indeed, the regulation change did not impact the terms of the settlement agreement or substantially impair the parties' contractual rights. See *All Star*, 332 Ga. App. at 13. And it certainly did not, as asserted by Singh, require Ultra to engage in any "effort to renegotiate the [s]ettlement [a]greement." Because there was no requirement that the settlement agreement be amended or modified to comply with the new COAM regulation, Singh's argument fails.

6. Singh asserts that the award of $118,600 in attorney fees and expenses to Ultra, as affirmed by the GLC chief executive officer and the superior court, is arbitrary, capricious, and clearly erroneous. We again find no error.

(a) Singh first argues that awarding attorney fees as a lump sum is not permitted under Georgia law. He bases this argument on the fact that Ultra only prevailed below on three of its four claims, and "fees awarded under OCGA § 13-6-11 [must] be attributable solely to the claims on which [the party] prevailed." See *Roberts v. JP*

*Morgan Chase Bank, Nat'l Ass'n*, 342 Ga. App. 73, 80(5) (802 SE2d 880) (2017). According to Singh, the hearing officer violated this requirement "[b]y awarding a non-apportioned sum under an erroneous theory of bad faith[.]" This claim fails.

Singh's argument ignores the well-settled exception to the fee apportionment rule: If the party's successful and unsuccessful claims are "intertwined," the party is not required to allocate its hours between the successful and unsuccessful claims. *Krayev v. Johnson*, 327 Ga. App. 213, 223(3) (757 SE2d 872) (2014). Here, the hearing officer made the specific finding that allocation by claim was not required:

> [Ultra]'s claim for breach of contract involving the two specified locations and the two unspecified locations involve the same factual issues and the same legal issues as [Singh's] defenses. Although this [h]earing [o]fficer failed to find that [Ultra] could not prevail on its damage claim based on [Singh's] failure to deliver 6201 Memorial Drive,[19] nevertheless, this [f]inal [o]rder finds and concludes that (1) [Singh] entered into the [s]ettlement [a]greement in bad faith, (2) [Singh] breached the [a]greement, (3) [Singh] caused harm to [Ultra], and (4) [Singh's] affirmative defenses are expressly denied. An allocation of fees is not required.

---

[19] This is a finding which we reverse in Case Nos. A26A0307 and A26A0337.

We conclude that the hearing officer's award of attorney fees and expenses to Ultra based on Singh's overall breach of the settlement agreement is proper in this action where Ultra filed a single breach of contract action based on a single agreement, even though Ultra only prevailed below on three of the four locations discussed in the settlement agreement.

(b) Singh next asserts that the award of fees is erroneous because the evidence does not show that he acted in bad faith in entering the settlement agreement. However, the hearing officer's conclusion that "Singh's dishonesty induced Ultra to dismiss its lawsuit and [Singh] had no intention of fulfilling all [his] obligations under the [s]ettlement [a]greement" is amply supported by the evidence. The hearing officer specifically detailed the evidence supporting her finding of bad faith, which included the following:

> Singh knew he was not the current owner of the business located at 6201 Memorial Drive when he contracted to give Ultra an 8-year contract at that location. The transcript of the [s]ettlement [a]greement showed that Judge Hutchinson specifically asked Singh if he was agreeing "to it both on your own behalf as well as on behalf of the other listed corporate defendants" to which Singh replied "Yes." See transcript of May 23, 2016. The evidence in the record also supports the finding that at the time Singh made the [a]greement, Singh had no intention of continuing

to work in the retail business and would therefore never be in a position to deliver on the two unspecified locations without being in the retail business or relying on others who were not in privity of contract with Ultra (or Singh). Finally, Singh knew he was under an obligation to provide for a[n] 8-year contract at 1317 Columbia Drive but intentionally sold that business days after the Agreement was reached.

These facts were taken from the record in the case. In addition, each fact relates to acts that occurred during the underlying transaction from which the breach of contract claim arises rather than during litigation. See *Fertility Tech. Res. v. Lifetek Med.*, 282 Ga. App. 148, 153(3) (637 SE2d 844) (2006) (holding that "the element of bad faith [under OCGA § 13-6-11] relates to the defendant's conduct in entering into the contract or pertains to the transaction and dealings out of which the cause of action arose, not to the defendant's conduct after the cause of action arose") (citation and punctuation omitted). Accordingly, the record supports the hearing officer's finding that Singh acted in bad faith to induce Ultra to agree to the settlement agreement and drop its lawsuit against him.

(c) Singh next argues that OCGA § 13-6-11 fees were not authorized in this action because "[a] genuine dispute exists regarding the effect of changes in the COAM laws, rules, and regulations." We disagree and find that the case cited by

Singh in his appellate brief is dispositive: "When bad faith is not an issue and the only asserted basis for a recovery of attorney fees is either stubborn litigiousness or the causing of unnecessary trouble and expense, there is not 'any evidence' to support an award pursuant to OCGA § 13-6-11 if a bona fide controversy clearly exists between the parties." *Fuel S. v. Metz*, 217 Ga. App. 731, 732-33(1) (458 SE2d 904) (1995) (citations and punctuation omitted). Here, bad faith *is* an issue, and Singh does not point to any authority where a change in the law disallows an award pursuant to OCGA § 13-6-11 when bad faith is involved. Moreover, as we found in Division 5 of this opinion, the COAM rule change did not affect Singh's ability to perform his obligations under the settlement agreement. Singh's argument regarding a genuine dispute lacks merit.

(d) Singh asserts that "[t]he disparity between the amount of damages demanded by [Ultra] and the amount awarded defeats [Ultra's] request for attorneys' fees and expenses."[20] This argument likewise lacks merit.

---

[20] Ultra demanded approximately $1,770,655.19 in damages for the value of the settlement agreement: $793,471.87 for the 1317 Columbia Drive location that should have been provided, $777,183.32 for the 6201 Memorial Drive location that should have been provided, and $200,000 for failure to deliver the two unspecified locations. The hearing officer only awarded Ultra $300,000 on its breach of contract claim because it erroneously concluded that Ultra was not entitled to any amount for the

Although Singh cites a case holding that a "[g]reat disparity between demand and verdict alone may defeat an award of attorney fees ... when bottomed on a stubbornly litigious theory[,]" *Gen. Refractories Co. v. Rogers*, 240 Ga. 228, 235(2) (239 SE2d 795) (1977), Singh has not presented any case law demonstrating that the same principle applies when bad faith is at issue. In fact, our case law indicates that the opposite is true. In *Ga.-Carolina Brick & Tile Co. v. Brown*, 153 Ga. App. 747, 752(2)(B) (266 SE2d 531) (1980), this Court specifically found "no such restrictions on the award of attorney fees and expenses of litigation for bad faith." In *Brown*, we held that "since the evidence authorized a finding of bad faith on the part of the appellant, the jury was authorized to award attorney fees ... even though it awarded less in damages than the plaintiff had claimed." Id. While recognizing the holding in *Rogers*, we found no inconsistency because the Supreme Court in *Rogers* held as a matter of law that there was no bad faith to justify an attorney fee award; the award in that case was based on stubborn litigiousness and not bad faith. Id. at 752-53(2)(B). While Singh attempts to distinguish *Brown* on the basis that it involved actual fraud

6201 Memorial Drive location, was entitled to only $200,000 under the settlement agreement for the two unspecified locations, and only proved nominal damages for the 1317 Columbia Drive location.

in a tort action, we find that the analysis applies equally as well in this case. Contrary to Singh's contention, his actions were not necessitated by compliance with GLC rules; many of his actions, in fact, occurred prior to the enactment of GLC RU 13.1.14(25). Singh's argument therefore lacks merit.

(e) We further find that Singh has abandoned his three-sentence assertion, devoid of any supporting authority, that the hearing officer committed a procedural error and demonstrated bias by accepting Ultra's fee statement minutes before the hearing. "In this regard, we have held that an argument is abandoned if it provides general citations to the 'most basic legal authority' without providing any legal authority or argument related to the specific facts of [the] case." *In the Interest of K. R.*, 367 Ga. App. 668, 677-78(2)(b) (888 SE2d 204) (2023). Legal analysis "is, at a minimum, a discussion of the appropriate law *as applied to the relevant facts*." *Gresham v. Harris*, 349 Ga. App. 134, 138(1) n. 9 (825 SE2d 516) (2019) (citation and punctuation omitted). And "mere conclusory statements are not the type of meaningful argument contemplated by our rules." *PraultShell, Inc. v. River City Bank*, 366 Ga. App. 70, 80(2) (880 SE2d 616) (2022) (citation and punctuation omitted).

Pretermitting whether Singh raised this issue below,[21] he has failed to provide a single decision supporting his argument. We therefore deem it abandoned.

In short, in Case Number A26A0416, we conclude that evidence supported the hearing officer's findings that the enactment of GLC RU 13.1.14(25) after the settlement agreement was entered into did not cause the settlement agreement to become illegal and impossible or require the agreement to be reformed. We further conclude that evidence supported the hearing officer's award of attorney fees and expenses to Ultra. We therefore affirm the superior court's affirmance of the hearing officer's decisions in this appeal.

*Judgment affirmed in part; reversed in part; and remanded with direction in Case Nos. A26A0307 and A26A0337; judgment affirmed in Case No. A26A0416. Barnes, P. J., and Markle, J., concur.*

---

[21] The record shows that Singh did not object to Ultra's introduction of its billing records into evidence.

45